O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA MARTINEZ,<br>RAUL MARTINEZ,<br>RUDY ALEXANDER MARTINEZ,<br>JANE DOE, a minor, and<br>JOHN DOE, a minor,<br><br>      Plaintiffs,<br><br>  v.<br><br>COUNTY OF LOS ANGELES,<br>DEPUTY MELVIN CASTRO<br>   (No. 516511),<br>DEPUTY JOSE HURTADO<br>   (No. 552712),<br>DEPUTY QUINN ALKONIS<br>   (No. 623539),<br>SGT. GREGORY BERG (No. 470638),<br>  and<br>DOES 1 THROUGH 10 inclusive,<br><br>      Defendants. | Case No. 2:20-cv-01063-JWH-MBK<br><br>**ORDER REGARDING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF No. 54] AND PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION [ECF No. 57]** |

# I.  SUMMARY OF DECISION

Before the Court are two opposing motions:

- the motion of Defendants County of Los Angeles (the "County"), Deputy Melvin Castro, Deputy Jose Hurtado, Deputy Quinn Alkonis, and Sergeant Gregory Berg for summary judgment regarding certain of the claims for relief asserted by Plaintiffs Cynthia Martinez, Raul Martinez, Rudy Alexander Martinez, Jane Doe, and John Doe,[1] and
- Plaintiffs' motion for summary adjudication regarding certain of their claims.[2]

Neither Motion is case-dispositive.  Each Motion is opposed and is fully briefed.[3]  The Court conducted a hearing on the Motions in December 2023.[4]  For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion and **DENIES** Plaintiffs' Motion.

# II.  PROCEDURAL BACKGROUND

Plaintiffs filed their original pleading in February 2020.[5]  Following the resolution of a related criminal case,[6] Plaintiffs filed their operative Amended Complaint in March 2022.[7]  Defendants filed their Answer in due course.[8]

In their Amended Complaint, Plaintiffs assert the following seven claims for relief:

---

[1]    Defs.' Mot. for Summ. J. as to Specified Claims in Pls.' Operative Compl. ("Defendants' Motion") [ECF No. 54].

[2]    Pls.' Mot. for Summ. Adjudication ("Plaintiffs' Motion") [ECF No. 57].

[3]    See Pls.' Opp'n to Defendants' Motion ("Plaintiffs' Opposition") [ECF No. 58]; Defs.' Opp'n to Plaintiffs' Motion ("Defendants' Opposition") [ECF No. 59]; Defs.' Resp. in Supp. of Defendants' Motion ("Defendants' Reply") [ECF No. 61]; Pls.' Reply in Supp. of Plaintiffs' Motion [ECF No. 62].

[4]    See Mins. of Hr'g re:  Plaintiffs' Motion & Defendants' Motion [ECF No. 63].

[5]    Compl. [ECF No. 1].

[6]    See Scheduling Notice and Order [ECF No. 29].

[7]    First Am. Compl. (the "Amended Complaint") [ECF No. 30].

[8]    Defs.' Answer to the Amended Complaint [ECF No. 31].

- excessive force in violation of 42 U.S.C. § 1983 (the "<u>First Claim</u>") by Cynthia and Rudy[9] against Deputy Castro, Deputy Hurtado, Deputy Alkonis, Sergeant Berg, and the Doe Defendants (collectively, the "<u>Individual Defendants</u>");[10]
- false arrest in violation of 42 U.S.C. § 1983 (the "<u>Second Claim</u>") by all Plaintiffs against the Individual Defendants;[11]
- negligence in violation of Cal. Gov't Code §§ 815.2(a) & 820(a) (the "<u>Third Claim</u>") by all Plaintiffs against the Individual Defendants;[12]
- common law assault and battery (the "<u>Fourth Claim</u>") by Cynthia and Rudy against the Individual Defendants;[13]
- a *Monell* claim for municipal liability in violation of 42 U.S.C. § 1983, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), (the "<u>Fifth Claim</u>") by all Plaintiffs against the County and the Doe Defendants;[14]
- violation of Cal. Gov't Code §§ 52 & 52.1 (the "<u>Bane Act</u>") (the "<u>Sixth Claim</u>") by all Plaintiffs against all Defendants;[15] and
- malicious prosecution in violation of 42 U.S.C. § 1983 (the "<u>Seventh Claim</u>") by Cynthia, Raul, and Rudy against all Defendants.[16]

Through their instant Motion, Defendants seek summary judgment in their favor on all of Plaintiffs' claims for relief except the First and Fourth Claims with respect to Rudy.[17] Conversely, Plaintiffs seek summary judgment on their Second Claim for false arrest with respect to Raul and Jane and John Doe, and on their Third Claim for negligence with respect to Raul and Jane and John Doe.[18]

---

[9]     Throughout this Order, the Court refers to Plaintiffs by their first names to avoid confusion among family members with the same surname; the Court intends no disrespect.

[10]     Amended Complaint ¶¶ 40-50.

[11]     *Id.* at ¶¶ 51-60.

[12]     *Id.* at ¶¶ 61-65.

[13]     *Id.* at ¶¶ 66-74.

[14]     *Id.* at ¶¶ 75-89.

[15]     *Id.* at ¶¶ 90-96.

[16]     *Id.* at ¶¶ 97-104.

[17]     *See generally* Defendants' Motion.

[18]     *See generally* Plaintiffs' Motion.

## III.  LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party.  *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  The substantive law determines the facts that are material.  *See id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  Factual disputes that are "irrelevant or unnecessary" are not counted.  *Id.*  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Under this standard, the moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  *See id.* at 325.  Instead, the moving party need only prove that there is an absence of evidence to support the nonmoving party's case.  *See id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  The party seeking summary judgment must show that "under the governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson*, 477 U.S. at 250.

If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial.  *See Celotex*, 477 U.S. at 324.  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  *Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252).  The non-moving party must make this showing on all matters placed at issue by the motion as to which the non-moving party has the burden of proof at trial.  *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252.

Furthermore, a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

Fed. R. Civ. P. 56(c)(2).  "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Advisory Committee Notes, 2010 Amendment, to Fed. R. Civ. P. 56.  Reports and declarations in support of an opposition to summary judgment may be considered only if they comply with Rule 56(c) of the Federal Rules of Civil Procedure, which requires that they "be made on personal knowledge, set forth facts that would be admissible evidence, and show affirmatively that the declarant is competent to testify to the matters stated therein." *Nadler v. Nature's Way Prod., LLC*, 2015 WL 12791504, at *1 (C.D. Cal. Jan. 30, 2015); *see also Loomis v. Cornish*, 836 F.3d 991, 996–97 (9th Cir. 2016) (noting that hearsay statements do not enter into the analysis on summary judgment).

## B. Evidentiary Objections

The material facts set forth below are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for the purpose of summary judgment.  *See* Fed. R. Civ. P. 56(e)(2); L.R. 56-3.  The court deems a fact undisputed when the parties' "disputes" of that fact are merely restatements of the same fact, they do not actually contradict the substance of a fact, or they argue the relevancy and materiality of an otherwise undisputed fact.  *See* Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

"[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself"; they are thus "redundant" and need not be considered.  *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").  The Court **OVERRULES** all such objections not otherwise specifically addressed.

## IV.  FACTS

## A. Cynthia's 911 Call and Dispatch's Call for Service

In the afternoon of December 20, 2018, officers from the Carson Sheriff's Station were dispatched to Plaintiffs' home in the City of Carson in response to a family disturbance call.[19]  During her deposition, Cynthia noted that previously that day she had consulted Carson Mental Health about her 20-year-old son Rudy's history of erratic

---

[19]     Am. Joint Statement of Undisputed Facts & Genuine Disputes (the "Joint Statement") [ECF No. 69] No. 14.

behavior, which included episodes of slamming doors and yelling profanities.[20] Representatives of Carson Mental Health instructed that in the event that Rudy behaved erratically in the future, Cynthia should call 911 to summon paramedics and a response team to evaluate and treat her son.[21]

Later that day, Cynthia's 13-year-old son, John Doe, called 911 and passed the phone to Cynthia.[22]  Although it is disputed whether Rudy actually behaved violently toward his family members,[23] Cynthia told the dispatcher that her son, "a special ed child," was "going out of control," was "going psycho," was "being very aggressive" and "very violent," and that she was "scared he [wa]s going to attack somebody." Cynthia also related to the dispatcher that her son did not have access to a firearm, but Rudy, who could be heard in the background, stated otherwise.[24]  Cynthia requested support from paramedics, stating "that's what he needs, he needs support from medical . . . ."[25]

The dispatcher relayed to the responding officers that Rudy was "going out of control," that he had a firearm (but that no firearm was visible), and that Rudy would be aggressive with the officers.[26]  The dispatcher told Cynthia to step outside and meet with the officers; Rudy followed Cynthia to the garage.[27]  The dispatcher later communicated to the responding officers that Rudy was following Cynthia around with a pocketknife.[28]

## B.    The Defendant Deputies Arrive at the Martinez Home

Defendants Deputy Castro, Deputy Alkonis, Deputy Hurtado, and Sergeant Berg (collectively, the "<u>Defendant Deputies</u>") responded to the call for service.  They met at the gate to the Martinez's property to formulate a tactical plan.[29]  The Defendant Deputies then approached the Martinez property with their firearms unholstered,[30] and

---

[20]    *See id.* at No. 72.

[21]    *See id.*

[22]    *See id.* at No. 73.

[23]    *See id.* at No. 71.

[24]    *Id.* at No. 75; Joint Compendium of Evid. (the "<u>Compendium</u>") [ECF No. 56], Ex. 27 (the "<u>911 Call</u>").

[25]    *See* Joint Statement No. 74; 911 Call.

[26]    *See* Joint Statement No. 15.

[27]    *Id.* at Nos. 78 & 79.

[28]    *Id.* at No. 15.

[29]    *See id.* at No. 17.

[30]    *Id.* at No. 94.

Cynthia—who has a physical disability for which she uses a cane as a mobility aid—met them outside.[31]

Deputy Castro asked Cynthia to identify her son—the disturbing party.[32]  As Cynthia was talking, Deputy Castro observed a person matching Rudy's description walking toward him; Rudy's right hand was in his pocket.[33]  Cynthia confirmed that the individual walking toward the Defendant Deputies was her son, Rudy.[34]  She also advised the Defendant Deputies multiple times that Rudy was "special ed."[35]  The Deputies did not ask Cynthia any more questions or otherwise consult her regarding the situation.[36]

At that point, Rudy was approximately 30 yards away from the Defendant Deputies, near his family's garage.[37]  Rudy's father, Raul, was standing to the side of the open garage door.[38]  It is disputed whether Rudy was exhibiting externalized indicators of mental illness, including fearfulness, pacing, muttering, talking to himself, failing to maintain eye contact, unusual eye or body movement, inability to communicate effectively, struggling to follow orders effectively, reclusiveness, extreme expression of emotion, failure to respond to commands, or memory loss.[39]  Nevertheless, the Defendant Deputies did not ask any questions of Rudy, Raul, or Cynthia about Rudy's mental state, and they did not contact the Mental Evaluation Team, paramedics, or the Los Angeles Fire Department to stage resources for mental health services.[40]  The Defendant Deputies also omitted from their incident reports that Cynthia told them that Rudy was "special ed."[41]

It is disputed whether the Defendant Deputies attempted to disengage or deescalate the situation.[42]  It is also disputed whether the Defendant Deputies believed that Rudy was armed and was possibly concealing a weapon and whether the Defendant

---

[31]     *Id.* at Nos. 18 & 70.

[32]     *Id.* at No. 81.

[33]     *Id.* at No. 18.

[34]     *Id.* at No. 19.

[35]     *Id.* at Nos. 90 & 96.

[36]     *See id.* at Nos. 82 & 83.

[37]     *Id.* at No. 84.

[38]     *Id.* at No. 23.

[39]     *See id.* at Nos. 24, 68, & 69.

[40]     *See id.* at Nos. 88 & 89.

[41]     *See id.* at No. 91.

[42]     *See id.* at Nos. 25 & 86.

Deputies asked to see Rudy's alleged weapon.[43]  It is undisputed, however, that the
Defendant Deputies decided to halt Rudy's retreat into the garage and that they
approached Rudy; Deputies Castro and Hurtado pointed their firearms at Rudy, and
Deputy Alkonis pointed her taser at him.[44]  As the Defendant Deputies advanced closer
to Rudy, they directed Cynthia to "get back" (or words to that effect), and Deputy
Castro ordered Rudy to stop, to remove his hand from his pocket, and to turn around.[45]
The Defendant Deputies gave Rudy simultaneous, overlapping commands.[46]

## C.  Physical Altercation and the Defendant Deputies' Use of Force

Cynthia inserted herself between the Defendant Deputies and Rudy, asserting that
Rudy was "special ed."[47]  Deputy Castro ordered Cynthia to back up, and he requested
that her younger son—John Doe—remove Cynthia from the scene.  Deputy Castro then
grabbed Cynthia, stating "Hey, you called us."[48]  Meanwhile, Rudy approached Deputy
Castro, but the manner of Rudy's approach—including whether Rudy verbally threatened
or physically harmed any of the Defendant Deputies or others at the scene up to that
point—is disputed.[49]

Deputy Castro punched Rudy in the face with both his right and left fists and
grabbed Rudy's right hand.[50]  Deputy Hurtado held Rudy's arms, with his arms around
Rudy's neck and shoulder, while Deputy Castro punched Rudy.[51]  Rudy appears to have
resisted the Defendant Deputies' use of force, although the nature of Rudy's actions
during the altercation is disputed.[52]  The Defendant Deputies and Rudy stumbled back
into the garage door, where Deputy Castro hit Rudy with his baton—first on Rudy's
shoulder and then on his leg—and Deputy Castro punched Rudy again.[53]  In the course of
the scramble, Deputy Castro fell to the ground twice.[54]

---

[43]    *See id.* at Nos. 20 & 93.

[44]    *See id.* at Nos. 26, 85 & 95.

[45]    *Id.* at Nos. 21 & 22.

[46]    *Id.* at No. 87.

[47]    *Id.* at No. 27.

[48]    *See id.* at Nos. 27, 28, 29, 62, & 97.

[49]    *See id.* at Nos. 30 & 100.

[50]    *See id.* at Nos. 31, 32, 33, 98, & 99.

[51]    *Id.* at Nos. 34, 103, & 104.

[52]    *See id.* at Nos. 35, 36, 37, 39, 101, & 102.

[53]    *Id.* at Nos. 106, 107, & 109.

[54]    *See id.* at Nos. 35, 36, & 43.

Raul pleaded with the Defendant Deputies to "[s]top, let him [*i.e.*, Rudy] be," and Cynthia and Raul physically joined the altercation between Rudy and the Defendant Deputies.[55]  Cynthia may have used her cane to prevent Deputy Castro from striking Rudy with his baton,[56] and, either as a result of Cynthia's action or on his own initiative, Deputy Alkonis grabbed Cynthia's cane.[57]  Deputy Castro placed himself between the parents and the other Deputies, and, after Deputy Alkonis tased Rudy twice and punched him three or four times, the Defendant Deputies eventually wrestled Rudy to the ground and handcuffed him.[58]  No Deputy at any point attempted to prevent or stop the Defendant Deputies' use of force.[59]

## D.  Detentions and Arrests

After the Defendant Deputies handcuffed Rudy, they also handcuffed Cynthia, Raul, and John Doe.[60]  The Defendant Deputies arrested Cynthia and Raul for Battery on a Peace Officer, but both were subsequently charged by the Los Angeles District Attorney with misdemeanor obstruction under Cal. Penal Code § 148.[61]  It is undisputed that John Doe never attempted to interfere with the Defendant Deputies nor to make physical contact with the Defendant Deputies; that the Defendant Deputies never considered John Doe to be a suspect; and that the Defendant Deputies never saw John Doe commit any illegal act.[62]  Nevertheless, the Defendant Deputies detained John Doe for more than an hour in a patrol car, where he remained in handcuffs for some of that time before he was interviewed.[63]  Eventually, the Defendant Deputies transported Rudy, Cynthia, Raul, and John Doe to the police station.[64]  No Deputy attempted to prevent or stop the arrests and detentions of the Martinez family members.[65]

---

[55]     *See id.* at Nos. 38, 42, 108, 113, & 114.

[56]     *See id.* at No. 40.

[57]     *Id.* at No. 105; *see also id.* at No. 41.

[58]     *See id.* at Nos. 44, 45, 46, 110, 111, & 115.

[59]     *See id.* at No. 132.

[60]     *Id.* at No. 115.

[61]     *Id.* at Nos. 46, 47, & 121

[62]     *Id.* at Nos. 113, 114, 117, & 118.

[63]     *See id.* at Nos. 115 & 116.

[64]     *See id.* at No. 120.

[65]     *See id.* at No. 133.

### E.    Minor Children Custody Issue

During the Martinez family's encounter with the police, Cynthia and Raul's nine-year-old daughter—Jane Doe—was in the care of neighbors, Juan and Maria Bernui.[66] The Defendant Deputies removed Jane Doe from the Bernuis' care without her parents' consent and transported Jane Doe to the police station, where both minor Martinez children—John and Jane Doe—were placed in the temporary custody of the Department of Children and Family Services ("DCFS").[67]  In Plaintiffs' Motion, they describe the specific circumstances of Jane Doe's seizure from the Bernuis' home based upon the declaration of Jane Doe,[68] but those events are not included in the Statement of Facts and are apparently disputed.[69]  It is undisputed, however, that no Deputy attempted to prevent or stop the custody transfer of the two minors.[70]

The parties dispute whether any officer informed Cynthia or Raul of the whereabouts of John and Jane Doe, but Cynthia's signature does appear on an Arrested Person's Children's form indicating that Cynthia was advised that she was entitled to two additional telephone calls to arrange for child care and that the minors were under the care of DCFS.[71]  Cynthia and Raul desired, and gave consent, for their eldest son, Raul Jr., to take physical custody of the minors while their parents were in police custody.[72]

### F.    Search of the Martinez Home

After the physical altercation, detentions, and arrests, members of the police team conducted a search of the Martinez home.[73]  The Defendant Deputies did not ask for consent to search the residence,[74] but Defendants claim that the Defendant Deputies received radio traffic alerting them that an unknown individual may have run into the

---

[66]    *See id.* at No. 122.

[67]    *See id.* at Nos. 53, 54, 120, & 123.

[68]    *See* Plaintiffs' Motion 10:7-27.

[69]    *See generally* Defendants' Opposition.

[70]    *See* Joint Statement No. 133.

[71]    *See id.* at No. 124; Compendium Ex. 19.

[72]    *See* Joint Statement No. 125.  Plaintiffs assert that fact Nos. 126 and 127—alleging that Raul Jr. attempted to collect the children at the police station but was refused—lack foundation and that they are thus inadmissible.

[73]    *See id.* at No. 58.

[74]    *Id.* at No. 128.

home.[75]  Deputy Castro was the handling deputy with the authority to authorize such a search, although it is disputed who actually authorized the search.[76]

In their search of the home, officers left drawers open, they misplaced items, and they broke doorhandles.[77]  The Deputy Defendants did not participate in the search,[78] but no Deputy attempted to stop or report the search.[79]

## G.    Legal Aftermath of the Arrests

The charges against Cynthia and Raul were dismissed.[80]  After initial proceedings in state court, the charges against Rudy were also dismissed.[81]

On December 24, 2018, the Los Angeles District Attorney filed a felony complaint against Rudy, thereby initiating the action captioned as *People v. Rudy Martinez*, Case No. TA147782 (the "Criminal Case").[82]  The felony complaint in the Criminal Case alleges that Rudy committed the following crimes on December 20, 2018:

- Battery with Injury on Peace Officer (Sergeant Berg) pursuant to Cal. Penal Code § 243(c)(2);
- Battery with Injury on Peace Officer (Deputy Hurtado) pursuant to Cal. Penal Code § 243(c)(2);
- Resisting Executive Officer (Deputy Castro) pursuant to Cal. Penal Code § 69; and
- Resisting Executive Officer (Deputy Alkonis) pursuant to Cal. Penal Code § 69.[83]

On December 18, 2019, Los Angeles County Superior Court Judge Lynn D. Olson conducted a preliminary hearing in the Criminal Case.[84]  Rudy was represented by

---

[75]    *See id.* at Nos. 58 & 60.

[76]    *See id.* at No. 130.

[77]    *See id.* at No. 129.

[78]    *See id.* at No. 59.

[79]    *See id.* at No. 131.

[80]    *See id.* at No. 134.

[81]    *See id.*

[82]    *Id.* at No. 2.

[83]    *Id.* at No. 3.

[84]    *Id.* at No. 5.

counsel during that proceeding,[85] and Deputy Castro and Deputy Alkonis both testified.[86] Rudy's counsel introduced into evidence a cell phone video of the incident.[87]

It is disputed whether the evidence now known to the Defendant Deputies is materially different from the evidence that was presented at the preliminary hearing,[88] but after considering the evidence and arguments from the prosecution and Rudy's counsel in the preliminary hearing, Judge Olson found sufficient cause to believe that Rudy was guilty of all counts alleged in the felony complaint.[89]  Nevertheless, the charges against Rudy were subsequently dropped.[90]

## H.    LASD Policy and Training

It is the policy of the Los Angeles Sheriff's Department ("LASD") that all sworn personnel have a duty to protect life, liberty, and property and to adhere to all federal and state laws.[91]  LASD Policy also requires Department members to use only that amount of force that is objectively reasonable to perform their duties.[92]  Department members must possess reasonable suspicion before detaining a suspect and probable cause before arresting a suspect.[93]  Officers are also trained to note in their incident reports if they make contact with a mentally ill suspect.[94]

## I.    LASD Deputy Gangs

Defendants concede that social groups known as "deputy gangs"—characterized by exclusivity, violent proclivities towards citizens, and shared signs and symbols—exist within the LASD.[95]  Those deputy gangs have a history of recruiting in jails.[96]  Deputy gangs are known to mark members with a shared tattoo, which is frequently positioned on

---

[85]     *Id.* at No. 6.

[86]     *Id.* at No. 7.

[87]     *Id.* at No. 8.

[88]     *Id.* at No. 12.

[89]     *Id.* at No. 10.

[90]     *Id.* at No. 134.

[91]     *Id.* at No. 63.

[92]     *Id.* at No. 64.

[93]     *Id.* at No. 65.

[94]     *Id.* at No. 92.

[95]     *Id.* at No. 135.

[96]     *Id.* at No. 136.

the member's lateral calf.[97]  One known deputy gang tattoo depicts a red-eyed skull holding a "dead man's hand" and a firearm.[98]

Deputy Hurtado has a tattoo on his lateral calf depicting a red-eyed skull holding a "dead man's hand" and a firearm.[99]  Deputy Hurtado received his tattoo as a new sheriff's deputy while he was assigned to a jail facility.[100]

# V.  ANALYSIS

### A.    Collateral Estoppel with Respect to Rudy's Claims Based Upon an Alleged Lack of Probable Cause to Arrest Him

Defendants first argue that Rudy is estopped from asserting his Second Claim for false arrest, his Third Claim for negligence, his Sixth Claim under the Bane Act, and his Seventh Claim for malicious prosecution to the extent that he asserts those claims based upon an alleged lack of probable cause to arrest him.  Defendants contend that the issue of probable cause was already litigated and was decided against Rudy in his Criminal Case.[101]

Pursuant to the doctrine of collateral estoppel—also known as issue preclusion— "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."  *Montana v. United States*, 440 U.S. 147, 153 (1979).  To determine whether collateral estoppel is appropriately applied in a case, a court examines three factors:  (1) "whether the issues presented by this litigation are in substance the same as those resolved against [a party in a prior case]"; (2) "whether controlling facts or legal principles have changed significantly since the [prior case's resolution]"; and (3) "whether other special circumstances warrant an exception to the normal rules of preclusion."  *Id.* at 155.

"[A] preliminary hearing determination 'that there was sufficient evidence to hold the plaintiff over for trial may, in some situations, preclude the plaintiff from relitigating the issue of probable cause to arrest in a subsequent civil suit.'"  *Patterson v. City of Yuba City*, 748 F. App'x 120, 121 (9th Cir. 2018) (quoting *McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138, 1147 (1999)).  But collateral estoppel will not apply when:  (1) "'the

---

[97]    *Id.* at Nos. 137 & 139.

[98]    *Id.* at No. 138.

[99]    *Id.* at No. 140.

[100]    *Id.* at No. 141.

[101]    Defendants' Motion 20:18-23:6; *see also* Defendants' Reply 2:13-3:25.

issue of probable cause was not litigated at the preliminary hearing for tactical reasons';
(2) the plaintiff has alleged that 'the arresting officer lied or fabricated evidence presented
at the preliminary hearing'; or (3) 'the evidence presented at the preliminary hearing
[was] not the same as the evidence available to [the officers] at the time of plaintiff's
arrest.'" *Id.* (quoting *McCutchen*, 73 Cal. App. 4th at 1147); *see also Awabdy v. City of
Adelanto*, 368 F.3d 1062, 1067-68 (9th Cir. 2004) ("a plaintiff can rebut a *prima facie*
finding of probable cause," such that collateral estoppel does not apply, "by showing that
the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence,
or other wrongful conduct undertaken in bad faith," including at the preliminary
hearing).

    Here, the issues of reasonable suspicion and probable cause were litigated during
the preliminary hearing in Rudy's Criminal Case, but whether the evidence now known to
Defendants is materially different from the evidence presented at the preliminary hearing
is disputed.[102]  Furthermore, Plaintiffs argue that Defendants presented false testimony
regarding the circumstances of Rudy's detention and arrest—specifically with respect to
the Defendant Deputies' knowledge of Rudy's "special education" status and the
potential legal effect of that knowledge, what Cynthia told Deputy Castro at the scene,
and whether and to what extent Rudy was behaving aggressively toward his family or the
Defendant Deputies.[103]  Those factual issues are largely disputed, and, therefore, they are
properly resolved by a jury.[104]  Accordingly, Defendants are not entitled to summary
judgment on the basis of collateral estoppel on the issues of reasonable suspicion or
probable cause to detain or arrest Rudy.  With respect to Defendants' collateral estoppel
argument, Defendants' Motion is **DENIED**.

## B.    Cynthia's Excessive Force Claims

    Next, Defendants argue that they are entitled to summary judgment on Cynthia's
First, Third, Fourth, Sixth, and Seventh Claims, to the extent that those claims are based
upon an alleged excessive use of force, because the force used against Cynthia was
objectively reasonable.[105]

---

[102]    *See supra* Part IV.G.

[103]    *See* Plaintiffs' Opposition 6:12-7:11; *see generally* Amended Complaint.

[104]    *See generally supra* Part IV.

[105]    Defendants' Motion 23:10-13 & 28:16-29:22.

Because Plaintiffs' Third Claim for relief for negligence arises from their § 1983
claims, throughout this Order the Court looks to the underlying § 1983 claims in
analyzing both their § 1983 and negligence claims.[106]

### 1.    § 1983 Excessive Force Claims

"In addressing an excessive force claim brought under § 1983, analysis begins by
identifying the specific constitutional right allegedly infringed by the challenged
application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "Where, as here, the
excessive force claim arises in the context of an arrest or investigatory stop of a free
citizen, it is most properly characterized as one invoking the protections of the Fourth
Amendment, which guarantees citizens the right 'to be secure in their persons . . . against
unreasonable . . . seizures' of the person." *Id.* "Determining whether the force used to
effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful
balancing of 'the nature and quality of the intrusion on the individual's Fourth
Amendment interests' against the countervailing governmental interests at stake." *Id.* at
396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

The Ninth Circuit's test for assessing the objective reasonableness of a particular
use of force considers: "(1) the severity of the intrusion on the individual's Fourth
Amendment rights by evaluating the type and amount of force inflicted, (2) the
government's interest in the use of force, and (3) the balance between the gravity of the
intrusion on the individual and the government's need for that intrusion." *Lowry v. City
of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (*en banc*) (quoting *Glenn v. Washington
County*, 673 F.3d 864, 871 (9th Cir. 2011)) (internal quotations omitted). "This standard
requires the court to 'judge the reasonableness of a particular use of force from the
perspective of a reasonable officer on the scene, rather than with the 20/20 vision of
hindsight.'" *Ballew v. City of Pasadena*, 2022 WL 17974488, at *13 (C.D. Cal. Nov. 23,
2022) (quoting *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)). "The calculus
of reasonableness must embody allowance for the fact that police officers are often forced to
make split-second judgments—in circumstances that are tense, uncertain, and rapidly
evolving—about the amount of force that is necessary in a particular situation." *Graham*,
490 U.S. at 396-97.

Here, many details of the physical altercation—including facts relating to
Cynthia's involvement—are disputed.[107] Because Cynthia's excessive force claims
depend upon those disputed facts, summary judgment based upon the merits of those

---

[106]    *See* Amended Complaint ¶¶ 61-65; *see also Black v. City of Blythe*, 562 F. Supp. 3d 820,
830 (C.D. Cal. 2022) (negligence claims may arise from § 1983 claims).

[107]    *See supra* Part IV.C.

claims is not appropriate.  With respect to Defendants' argument that the force used against Cynthia was objectively reasonable, Defendants' Motion is **DENIED**.

### 2.    Qualified Immunity for Cynthia's Excessive Force Claim

Defendants further argue that Deputy Castro is entitled to qualified immunity with respect to Cynthia Martinez's First Claim for excessive force.[108]

### a.    Qualified Immunity Standard

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).  Thus, a qualified-immunity analysis involves two separate steps:  the court first determines whether the facts show that the officer's conduct violated a constitutional right; if so, the court must then determine whether that constitutional right was clearly established at time of the alleged unlawful action.  *See id.*; *Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009).  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor*, 575 U.S. at 825 (brackets and internal quotation marks omitted).

The non-movant bears the burden of proving the second prong.  *See, e.g.*, *Johnson v. Barr*, 79 F.4th 996, 1004-05 (9th Cir. 2023).  The law does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Nevertheless, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (*per curiam*)); *see also Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1078 (9th Cir. 2011) (holding that "the question in determining whether qualified immunity applies is whether all reasonable officers would agree that [the officer's behavior violated the plaintiff's rights] in this instance").  "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 584 at 104 (quoting *White*, 580 U.S. at 79).

### b.    Application to Cynthia's Excessive Force Claims

Defendants argue that "no prior case gave Deputy Castro notice that a push or shove to move Cynthia out of the way while attempting to detain an assaultive, high-risk, potentially armed suspect [*i.e.*, Rudy], was an unconstitutional use of force."[109]  In their

---

[108]    Defendants' Motion 23:13-17 & 25:1-28.

[109]    *Id.* at 25:13-15.

Opposition, Plaintiffs counter that Cynthia had a "clearly-established right to be free from excessive force," and they cite a non-precedential case—*Acasio v. Lucy*, 2017 WL 1316537 (N.D. Cal. Apr. 10, 2017)—for the proposition that officers are "not entitled to qualified immunity merely because [their] push did not result in injury."[110]  *Id.* at *8.  In reply, Defendants acknowledge that "the standard for reasonableness under the Fourth Amendment is objective" and that "not every push or shove, even if it may later seem unnecessary, violates the Fourth Amendment," but they argue that the "force used against Cynthia amounted to nothing more than a push or shove in the context of a volatile, rapidly evolving situation."[111]

Here, many of the facts concerning the altercation—including whether Rudy was "assaulting, high-risk, [and] potentially armed," as Defendants assert—are in dispute.[112] But, even assuming the existence of the first prong—that Deputy Castro violated Cynthia's Fourth Amendment rights—Deputy Castro is entitled to qualified immunity under the second prong.

Plaintiffs cite *Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001), for the proposition that "[w]hen the circumstances show that there is no need for force, any force used— including a push of [*sic*] pull—is constitutionally unreasonable."[113]  *See id.* at 880.  But the Ninth Circuit in *Fontana* did not address the issue of qualified immunity.  *See id.* at 882 n.8.  Furthermore, the *Fontana* court was discussing a "sexual bodily intrusion"; the Ninth Circuit noted that "there can be no 'countervailing governmental interest' to justify sexual misconduct."  *Id.* at 880 (quoting *Graham*, 490 U.S. at 396).  Therefore, *Fontana* is inapt.

Plaintiffs also rely upon *Jimenez v. City of Costa Mesa*, 174 F. App'x 399 (9th Cir. 2006).  Although the particular section of that non-precedential case to which Plaintiffs cite does not deal with qualified immunity, a different section does.  In *Jimenez*, the Ninth Circuit determined that an officer was entitled to qualified immunity for his single push of one plaintiff who leaned over the officer during an arrest, which did not result in any injury to the plaintiff:  "When weighed against the government's interest in this case, the minimal intrusion was objectively reasonable under the circumstances."  *Id.* at 402. However, the Ninth Circuit held that the same officer was not entitled to qualified immunity for pushing a different plaintiff, resulting in "several injuries" to that plaintiff, in response to that plaintiff's verbal inquiry about the arrestee from three to four feet

---

[110]    *See* Plaintiffs' Opposition 7:12-8:11.

[111]    Defendants' Reply 4:1-12.

[112]    *See supra* Part IV.C.

[113]    Plaintiffs' Opposition 8:2-5.

away; the *Jimenez* court determined that "[a] reasonable officer under the circumstances 'would have had fair notice that the force employed was unlawful, and that any mistake to the contrary would have been unreasonable.'" *Id.* (quoting *Drummond* ex rel. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003)). Deputy Castro's treatment of Cynthia in this case—grabbing her, without causing her any injury, when she inserted herself in the altercation between the Defendant Deputies and Rudy—is more akin to the officer's behavior in *Jimenez* with respect to the first plaintiff, for which that officer was entitled to qualified immunity, rather than the second plaintiff.

Finally, *Acasio v. Lucy*, 2017 WL 1316537 (N.D. Cal. Apr. 10, 2017), which Plaintiffs also cite, dealt with an officer who pushed an elderly plaintiff who "was complying with the officer's orders and did not otherwise present a threat to anyone's safety" "onto [a] chair with such force that [the plaintiff] fell to the ground injuring her hip and back." *Id.* at *9. Again, here, Deputy Castro caused Cynthia no harm when he grabbed her as he attempted to move her aside.

Although relevant authorities need not be directly on point to qualify as "clearly establish[ing]" a plaintiff's rights for the purpose of qualified immunity, none of the cases that Plaintiffs raise here would have put Deputy Castro on notice that his conduct violated Cynthia's Fourth Amendment rights. Therefore, Defendants' Motion with respect to Cynthia's First Claim for excessive force is **GRANTED** because Deputy Castro is entitled to qualified immunity on that claim.

## C.   Cynthia and Raul's False Arrest Claims

Defendants assert that they are entitled to summary judgment on Cynthia and Raul's Second, Third, Fourth, Sixth, and Seventh Claims for relief to the extent that those claims are based upon an alleged lack of probable cause to arrest them because the Defendant Deputies possessed probable cause pursuant to Cal. Penal Code § 148.[114] Plaintiffs oppose those arguments[115] and contend in their own Motion that the Defendant Deputies lacked any probable cause to arrest Raul because, pursuant to Cal. Penal Code §§ 692 and 694, Cynthia and Raul were using reasonable force to defend Rudy from the Defendant Deputies' excessive use of force. Plaintiffs assert that they are therefore entitled to summary judgment with respect to Raul's false arrest and negligence claims.[116]

---

[114]   Defendants' Motion 26:1-28:7 (Second Claim) & 28:16-29:22 (Third, Fourth, Sixth, and Seventh Claims).

[115]   Plaintiffs' Opposition 8:12-16:14.

[116]   Plaintiffs' Motion 11:1-13:1.

### 1.    § 1983 False Arrest Claims

"A warrantless arrest of an individual in a public place for a [violation of law] committed in the officer's presence[] is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). "To determine whether an officer had probable cause to arrest an individual, [the court] examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause"—*i.e.*, that the arrestee was guilty of the violation of law. *Id.* at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). That determination "depends on the totality of the circumstances." *Id.*

California law prohibits "willfully resist[ing], delay[ing], or obstruct[ing] any public officer [or] peace officer . . . in the discharge or attempt[ed] discharge [of] any duty of his or her office or employment." Cal. Penal Code § 148(a)(1). "California courts have concluded that [§ 148] 'penalizes even passive delay or obstruction of an arrest, such as refusal to cooperate.'" *Hart v. City of Redwood City*, 99 F.4th 543, 552 n.4 (9th Cir. 2024) (quoting *People v. Curtis*, 70 Cal. 2d 347, 356 n.6 (1969), *disapproved on another ground in People v. Gonzalez*, 51 Cal. 3d 1179, 1222 (1990)). The statute "cannot be supposed to 'criminalize[] a person's failure to respond with alacrity to police orders,' but where the suspect acts defiantly, such passive obstruction has been held to satisfy Section 148." *Id.* (quoting *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1330 (2002)).

"Under [California] Penal Code, sections 835 and 835a, an officer may lawfully use only [r]easonable force to make an arrest or to overcome resistance." *Curtis*, 70 Cal. 2d at 356–57. And California law authorizes "other parties" "in aid or defense of [a] person about to be injured" to "make resistance sufficient to prevent the [commission of a public] offense." Cal. Penal Code §§ 692 & 694; *see also Curtis*, 70 Cal. 2d at 357 ("Sections 692 and 693 set forth the basic privilege one has to defend against unlawful force."). Pursuant to those statutes, the "long-standing rule" in California is "that although one is not immune from criminal liability for his resistance to an invalid police action, he cannot be convicted of an offense *against a peace officer 'engaged in . . . the performance of . . . duties'* unless the *officer* was acting lawfully at the time." *Gonzalez*, 51 Cal. 3d at 1217 (emphasis and alteration in original).

"California cases hold that although the court, not the jury, usually decides whether police action was supported by legal cause, disputed facts bearing on the issue of legal cause must be submitted to the jury considering an engaged-in-duty element, since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense." *Id.* Here, such "disputed facts" pervade the analysis of Cynthia and Raul's claims for false arrest. Indeed, Defendants did not move for summary judgment on Rudy's claim for excessive force; during the hearing, Defendants' counsel conceded that doing so would

have been an overreach.  Therefore, to the extent that Cynthia and Raul interfered with Rudy's arrest—which, itself, is disputed—the reasonableness of their interference is similarly in dispute and properly belongs before a jury for resolution.  Therefore, Defendants' Motion with respect to Cynthia and Raul's claims based upon their allegedly unlawful arrests, and Plaintiffs' Motion with respect to the Raul's claims specifically, are **DENIED**.

### 2.    Qualified Immunity for Cynthia and Raul's False Arrest Claims

Defendants argue that the Defendant Deputies are entitled to qualified immunity with respect to Cynthia and Raul's claims for false arrest:  "When considering the perimeter Deputies were trying to maintain around the arrest of Rudy, the difficulty the Deputies were having with gaining control of Rudy, and the escalating nature of the physical altercation with Rudy, a reasonable officer could have believed that probable cause existed to arrest Raul and Cynthia for refusing to get back and interfering with their efforts to place Rudy under arrest during the incident."[117]

"'[W]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.'"  *Johnson*, 79 F.4th at 1005 (quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003)).  In their brief reference to qualified immunity, Defendants do not address Plaintiffs' argument regarding the defense-of-others exception under Cal. Penal Code §§ 692 and 694; that analysis, as discussed above, depends heavily upon disputed facts.[118]  Therefore, the application of qualified immunity is not appropriate at this stage.  Defendants' Motion, with respect to the application of the qualified immunity defense to Cynthia and Raul's claims for false arrest, is **DENIED**.

## D.    Lawfulness of Defendants' Treatment of Minors John and Jane Doe

Defendants argue that they are entitled to summary judgment on Plaintiffs' Second, Third, and Sixth Claims to the extent that those claims are based upon the Defendant Deputies' delivery of minors John and Jane Doe into DCFS custody.[119]

Plaintiffs oppose those arguments,[120] and they contend in their own Motion that no exigent circumstances justified Defendants' warrantless removal of Jane and John Doe

---

[117]    Defendants' Motion 28:10-15; *see also* Defendants' Opposition 12:1-7.

[118]    *See supra* Part V.C.1.

[119]    Defendants' Motion 29:23-33:22.

[120]    Plaintiffs' Opposition 8:12-16:14.

from their parents' custody,[121] that Defendants' warrantless seizure of Jane Doe from her neighbors' home violated the Fourth Amendment,[122] that Defendants lacked any reasonable suspicion to detain John Doe in handcuffs after the incident,[123] and that, therefore, they—John and Jane Doe—are entitled to summary judgment on their Second and Third Claims.[124]

### 1.    § 1983 False Arrest and Negligence Claims for Placing the Minors in DCFS Custody

The parties agree on the governing law regarding the warrantless placement of John and Jane Doe into DCFS custody:  "Officials, including social workers, who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007).

Defendants cite only *United States v. Bradley*, 321 F.3d 1212 (9th Cir. 2003), for the proposition that John and Jane Doe necessarily "faced imminent danger of serious bodily injury in the time it would take to obtain a warrant" because both parents had been arrested, and, therefore, neither parent was available to care for the minors. *Id.* at 1215. *Bradley* involved a nine-year-old child and the child's claim arising from the defendant officers' warrantless entry into his house. *See generally id.*  The officers who arrested the child's mother on drug charges could not find the child in the places where the mother said that he was located. *See id.* at 1215.  The officers entered the house "to determine if [the child] was being supervised by a responsible adult," which the district court held— and the Ninth Circuit affirmed—was protected by the community caretaking exception to the Fourth Amendment's warrant requirement. *Id.* at 1214-15.  *Bradley* does not elaborate on whether the community caretaking exception extends to circumstances in which a child is apparently being supervised by a responsible adult, as Jane Doe was by the Bernui family, or—as in John Doe's case—when the child is alone at home but is a teenager and there is no clear indication of unsafe conditions (such as drugs) in the home.  Finally, *Bradley* does not deal with the **removal** of a child at all; it addresses only a warrantless entry into a home.

Here, the undisputed facts do not conclusively support either Defendants' or Plaintiffs' positions regarding the alleged wrongful transfer of the minor children into DCFS custody—neither child was conclusively in danger or conclusively safe, and the

---

[121]    Plaintiffs' Motion 6:13-9:15.

[122]    *Id.* at 9:16-10:27.

[123]    *Id.* at 11:1-13:1.

[124]    *Id.* at 13:2-22.

extent to which the parents were allowed to arrange for the care of the children is
disputed.  Indeed, in Defendants' Opposition to Plaintiffs' Motion, Defendants rely upon
*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000), to argue that "[w]hether reasonable
cause to believe exigent circumstances [to justify the removal of minor children] exist in a
given situation, 'and the related questions, are all questions of fact to be determined by a
jury.'"[125]  Therefore, both Defendants' and Plaintiffs' Motions with respect to the
placement of the minor children into DCFS custody are **DENIED**.

### 2.    Plaintiffs' Motion with Respect to the Warrantless Seizure of Jane Doe and the Detention of John Doe

Plaintiffs contend that Jane Doe is separately entitled to summary judgment on her
Second and Third Claims for the Defendant Deputies' warrantless seizure of her from
the Bernuis' home.[126]  Similarly, Plaintiffs argue that John Doe is entitled to summary
judgment on his Second and Third Claims for the Defendant Deputies' conduct in
detaining him with handcuffs without reasonable suspicion.[127]  Defendants respond that
Plaintiffs have failed to prove causation—*i.e.*, that the Defendant Deputies actually
participated in the seizure and detention of the minors—and that whether exigent
circumstances existed to authorize the seizure and detention of the children is disputed
and appropriate for resolution by a jury.[128]  As discussed, the factual history of this case
concerning the minor children is almost entirely disputed.[129]  Therefore, Plaintiffs'
Motion with respect to the seizure and detention of Jane and John Doe is **DENIED**.

### 3.    Qualified Immunity for the Minors' Claims

Defendants argue that, "[a]t minimum, no reasonable officer in this case would
believe that placing John Doe and Jane Doe in temporary protective custody with DCFS
would violate the Fourth and Fourteenth Amendments . . . particularly given the short
notice and the Deputies' lack of experience or expertise with child custody
evaluations."[130]  In response, Plaintiffs cite *In re S.D.*, 99 Cal. App. 4th 1068 (2002), for
the proposition that "[t]here is no 'Go to jail, lose your child' rule in California" and
that, pursuant to that case, the Defendant Deputies were on notice that Cynthia and Raul
were entitled to the opportunity to arrange for their minor children's care.  *Id.* at 1077–78.

---

[125]    Defendants' Opposition 7:1-3 (quoting *Wallis*, 202 F.3d at 1138).

[126]    Plaintiffs' Motion 9:16-10:27 (Second Claim) & 13:3-22 (Third Claim).

[127]    *Id.* at 11:1-12:21 (Second Claim) & 13:3-22 (Third Claim).

[128]    Defendants' Opposition 4:22-7:26.

[129]    *See supra* Parts IV.D, IV.E, & V.D.1.

[130]    Defendants' Motion 31:8-13; *see also* Defendants' Opposition 8:9-9:6.

As discussed, the facts underlying Plaintiffs' wrongful removal claims are in
dispute, but Plaintiffs' citation to the *S.D.* case is persuasive regarding the qualified
immunity issue. Therefore, Defendants' claim of qualified immunity in defense of the
minor children's claims is **DENIED**.

### 4.    The Minors' Bane Act Claim

Defendants aver that they are separately entitled to summary judgment on John
and Jane Doe's Sixth Claim under the Bane Act to the extent that that claim is based
upon the children's wrongful detention and seizure and the transfer of the children into
DCFS custody.[131]

"'The essence of a Bane Act claim is that the defendant, by the specified improper
means (*i.e.*, threats, intimidation or coercion), tried to or did prevent the plaintiff from
doing something he or she had the right to do under the law or to force the plaintiff to do
something that he or she was not required to do under the law.'" *Shoyoye v. Cnty. of Los
Angeles*, 203 Cal. App. 4th 947, 955–56 (2012) (quoting *Jones v. Kmart Corp.*, 17 Cal. 4th
329, 334 (1998)). "A defendant is liable if he or she interfered with or attempted to
interfere with the plaintiff's constitutional rights by the requisite threats, intimidation, or
coercion." *Id.* at 956. "[W]here coercion is inherent in the constitutional violation
alleged, . . . the statutory requirement of 'threats, intimidation, or coercion' is not met"
because "[t]he statute requires a showing of coercion independent from the coercion
inherent in the wrongful detention itself." *Id.* at 959; *see also Allen v. City of Sacramento*,
234 Cal. App. 4th 41, 69, *as modified on denial of reh'g* (Mar. 6, 2015) ("a wrongful arrest
or detention, without more, does not satisfy both elements of [the Bane Act]," and
"conclusory allegations of 'forcible' and 'coercive' interference with plaintiffs'
constitutional rights are inadequate to state a cause of action [under the Bane Act]").

Here, Plaintiffs' only constitutional theory of recovery for John and Jane Doe is for
wrongful seizure.[132] With respect to John Doe's claims, Plaintiffs concede that the
contemplated coercion was "inherent in Defendant Deputies' placement of [him] into
protective custody."[133] Therefore, to the extent that John Doe's Bane Act claim is
premised on his wrongful seizure and delivery into DCFS custody, Defendants' Motion is
**GRANTED**.

With respect to Jane Doe, however, Plaintiffs argue that "Defendant Deputies
made clear, unequivocal threats in the presence of Jane Doe to arrest Mr. and Mrs. Bernui

---

[131]    Defendants' Motion 32:1-8 & 32:11-22.

[132]    *See generally* Amended Complaint.

[133]    Plaintiffs' Opposition 21:7-10.

and take Jane Doe into custody if they did not comply with the deputies' orders to give them custody of her."[134]  Therefore, to the extent that Jane Doe's Bane Act claim is premised on her wrongful seizure and delivery into DCFS custody, Defendants' Motion is **DENIED**.

### 5.    Statutory Immunity

Defendants assert that they are entitled to statutory immunity under Cal. Gov't Code §§ 815.2, 820.2, and 821.6 with respect to Plaintiffs' Third Claim for negligence and Plaintiffs' Sixth Claim under the Bane Act, to the extent that those claims are based upon the acts of taking Jane and John Doe into protective custody.[135]

Under Cal. Gov't Code § 815.2, "California public entities, including local governments, are derivatively liable for the negligent acts or omissions of public employees within the scope of their employment." *AE* ex rel. *Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 638 (9th Cir. 2012).  But California law declares that public employees are not liable for ***discretionary*** acts or omissions, regardless of whether that discretion was abused.  *See* Cal. Gov't Code § 820.2.  California also provides prosecutorial immunity for a "public employee" who "institut[es] or prosecut[es] any judicial or administrative proceeding within the scope of his employment, even if [the public employee] acts maliciously and without probable cause."  *Id.* at § 821.6.  Another provision of California law extends individual public employees' immunity to the public entity that employs them.  *See id.* at § 815.2.  Finally, the law limits immunity for juvenile court social workers, child protection workers, and other similar public employees for perjury, fabrication of evidence, failure to disclose exculpatory evidence, or obtaining testimony by duress, fraud, or undue influence, if those acts were committed with malice. *See id.* at § 820.21.

In their Opposition, Plaintiffs correctly assert that neither Cal. Gov't Code § 820.2 nor § 821.6 applies here.  "'As a matter of law, section 820.2 [discretionary] immunity does not apply to an officer's decision to detain or arrest a suspect,'" because "§ 820.2 covers only 'policy' decisions made by a 'coordinate branch[] of government,' not 'operational decision[s] by the police purporting to apply the law.'"  *Sharp v. Cnty. of Orange*, 871 F.3d 901, 920–21 (9th Cir. 2017) (quoting *Liberal v. Estrada*, 632 F.3d 1064, 1084-85 (9th Cir. 2011), *overruled on other grounds by Hampton v. California*, 83 F.4th 754, 772-73 (9th Cir. 2023), *cert. denied sub nom. Diaz v. Polanco*, 144 S. Ct. 2520 (2024)).

---

[134]    *Id.* at 20:27-21:1.

[135]    Defendants' Motion 32:8-10 & 32:23-33:22; *see also* Defendants' Opposition 9:7-10:7.

Similarly, "[t]he 'prosecutorial' immunity under Cal. Gov. Code § 821.6 does not apply because it is limited to malicious-prosecution claims." *Id.*

Therefore, Defendants' claim of statutory immunity is **DENIED**.

## E.    Lawful Search

Defendants contend that they are entitled to summary judgment on Plaintiffs' Second Claim for false arrest to the extent that that claim is based upon the allegedly unlawful search of the Martinez family home.[136]  Defendants argue that the search was justified as a "protective sweep"—"'a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others.'"[137]  Defendants cite *United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989), for the proposition that the search—characterized as a "protective sweep"—was constitutional because the Defendant Deputies were attempting only to secure the house after its residents had been arrested just outside the door.[138]

As both parties agree, warrantless searches of a home are presumptively unreasonable and, therefore, unconstitutional.  *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 587 (1980).  A warrantless search may be justified as a "protective sweep" when the ***facts*** would lead a reasonable officer to believe that the need to secure the home was justified. *See Buie*, 494 U.S. at 334.  And the "protective sweep," if justified, must be limited to the extent reasonable to secure the premises.  *See id.* at 335-36.

Here, the facts regarding the reasonableness of searching the Martinez home at all, and the reasonableness of the extent of that search—which unquestionably left the home in a shambles—are in dispute.[139]  Therefore, summary judgment is inappropriate; Defendants' Motion with respect to the search of the home is **DENIED**.

## F.    *Monell* Claim

Finally, Defendants assert that they are entitled to summary judgment on Plaintiffs' Fifth Claim under *Monell*.[140]

---

[136]    Defendants' Motion 33:23-34:28.

[137]    *Id.* at 34:7-10 (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)).

[138]    *See id.* at 34:2-28.

[139]    *See supra* Part IV.F.

[140]    Defendants' Motion 35:2-36:16.

*Monell* stands for the proposition that a local government can be liable for a § 1983 claim against its individual employee. *See generally Monell*, 436 U.S. 658. A local government is liable for an injury under § 1983 under three circumstances: (1) the local government's policy or custom inflicted the injury; (2) the local government failed to train its employees in a manner that amounts to "deliberate indifference" to a constitutional right; or (3) the individual who committed the constitutional violation was a final decisionmaker or ratified the unconstitutional conduct. *See Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018).

Defendants' Motion is **GRANTED** with respect to the individual claims on which they are entitled to summary judgment—Cynthia's First Claim for excessive force and John Doe's Bane Act Claim, to the extent that that claim is premised on his wrongful detention and delivery into DCFS custody—because the County cannot be liable for conduct that is not unconstitutional. *See generally Monell*, 436 U.S. 658.

With respect to Plaintiffs' remaining § 1983 claims, Defendants' Motion is **DENIED**. Although the County's ***official*** policies and training materials prohibit constitutional violations like the ones alleged in this case, the County's ***unofficial*** policies and ***actual*** training practices—including with respect to the so-called Deputy gangs—are in dispute.[141]

## VI. DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.    Defendants' Motion is **GRANTED in part** and **DENIED in part**.

2.    Specifically, Defendants' Motion is **GRANTED** with respect to the following issues and claims:

      a.    Cynthia Martinez's First Claim for excessive force;

      b.    John Doe's Sixth Claim for violation of the Bane Act, to the extent that that claim is premised on his allegedly wrongful detention and delivery into DCFS custody; and

      c.    Plaintiffs' *Monell* claim with respect to the above two claims.

3.    Except in noted in Paragraph 2 above, Defendants' Motion is **DENIED**.

---

[141]    *See supra* Parts IV.H & I.

4.    Plaintiffs' Motion is **DENIED**.

5.    Pursuant to the Court's earlier Order vacating the case schedule,[142] the
parties are **DIRECTED** to confer forthwith and to file no later than September 19, 2025,
a Joint Status Report and proposed scheduling order.

6.    A Scheduling Conference is **SET** for October 3, 2025, at 11:00 a.m. in
Courtroom 9D of the Ronald Reagan Federal Building and U.S. Courthouse, 411 W. 4th
Street, Santa Ana, California.  Counsel for the parties are **DIRECTED** to appear at that
date and time.

**IT IS SO ORDERED.**

Dated:____September 2, 2025____       _____

John W. Holcomb
UNITED STATES DISTRICT JUDGE

---

[142]    *See* Order Granting Joint Stipulation to Modify Scheduling order [ECF No. 67].